# In re Romm

*Compton & Handler* and *Arthur Berman*, for petitioner.

*Homer L. Kreider*, for objectors.

NEELY, J., June 5, 1951.—This matter is before us on the petition of Ida Abrams Romm to change her name to Ida Abrams, her maiden name, in accordance with the provisions of the Act of April 18, 1923, P. L. 75, 54 PS §1. Petitioner was married on June 14, 1942, in the City of Harrisburg, to Milton Romm, an attorney who was a member of the bar of Philadelphia County. One child, Stephen Nathaniel Romm, was born of this marriage on July 17, 1943. The child is now under the custody of his mother, petitioner herein. After the marriage petitioner and her husband lived

for a period of time in Williamsport, Pa., and thereafter in Philadelphia.

Petitioner separated from her husband in August of 1945. She returned to Harrisburg after the separation, and by complaint filed on February 25, 1946, instituted proceedings in divorce against her husband. The grounds alleged in the complaint were cruel and barbarous treatment and indignities to the person. Milton Romm died on April 5, 1946. The divorce proceedings had not been disposed of at the time of his death.

Petitioner was born in Harrisburg, October 25, 1910. Her father, B. Abrams, had for many years been engaged in the junk business in this city, and at the time of petitioner's marriage was doing business under the name of B. Abrams and Sons. Petitioner had worked for her father at his place of business in Harrisburg before her marriage, and when she returned to this city after the separation she went to work at the same business establishment as a secretary for one of her brothers.

Petitioner desires to change her name because of existing confusion and embarrassment to her in the use of the name Romm. Objection to granting the prayer of this petition has been entered by Mrs. Martha Shulman, Mrs. Myndell Horr and Mrs. Arline Orovitz, sisters of petitioner's deceased husband.

Petitioner is of the Jewish faith, as was her husband. She is engaged in civic and charitable activities. Many of these activities are identified with the church to which petitioner belongs. According to the evidence, she has extensive social contacts in this community. She testified that most of her friends and acquaintances know her as Ida Abrams; that although she is listed in the telephone directory as Ida Romm, very few people know her by that name and many persons call the place of business to ascertain her home address. Her

testimony is that in her social, civic and charitable activities there is confusion and embarrassment to her in the use of the name Romm.

The evidence shows that in her employment petitioner is known by all the employes as Ida Abrams, the evidence being that B. Abrams and Sons has a total of 40 employes. She testified that customers doing business with B. Abrams and Sons also know her generally as Ida Abrams. Petitioner also claims, therefore, that the name Romm is an embarrassment to her at her work and is a source of confusion and inconvenience, and further that this confusion affects her work. She said this confusion affects not only her but her friends and business associates as well.

On the other hand objectors point out that their father, Solomon Nathan Romm, Stephen Nathaniel's grandfather, had been a resident of Palmyra, N. J., and had been in business there for many years. The grandmother lived there also for a great length of time. It was pointed out that the Romm family over a long period of time had taken an active part in the affairs of that community. The grandfather and grandmother of Stephen Nathaniel are both now deceased.

It is maintained by objectors that Stephen Nathaniel is named for his grandfather, Solomon Nathan Romm. They claim that Stephen Nathaniel, as Anglicized, corresponds to Solomon Nathan in Hebrew. Hence, they maintain that the child is named for his grandfather, and that this is of particular significance to Jewish people. The objectors maintain that the name Romm enjoyed respect in the community of Palmyra, and in Philadelphia where the father practiced law, and maintain that under these circumstances petitioner should not be allowed to change her name if it means the change of Stephen Nathaniel's name also. They point out that he is the last male child of the family bearing the surname Romm.

It appears from the evidence that there is great significance among people of the Hebrew faith in having a boy bear the name of his deceased grandfather or any deceased ancestor. The testimony of Rabbi Etters is significant in this case. He was called by petitioner and his testimony has not been contradicted by objectors. Rabbi Etters emphasized that in the Hebrew faith particular importance is attached to the use of the first or given name, and that this first name of the individual is used exclusively in religious services. He stated that there was no tradition among the Jewish people that would prevent the change of the surname, and that there was no tradition of continuity in the use of the surname by a particular family from one generation to another. In effect, the Rabbi testified that such change of surname had for many years been a commonplace occurrence, and that he knew of many such changes, both here and in the "old country". The rabbi was a native of Russia.

In ancient England whose traditions are woven so deeply into the fabric of our common law, the Christian or given name was of controlling importance. The Christian names were recorded in the baptismal registers in accordance with the requirements of ecclesiastic law, and in early times these were the only names by which persons were known. It was not until after the middle of the fourteenth century that surnames came into somewhat general use. The insufficiency of the baptismal or Christian name, to distinguish a particular individual where there were many persons bearing the same name, led of necessity to the giving of surnames, and then a man became distinguished in addition to his Christian name by such surname as was applied to him.

These surnames came from varied sources. They might have been employed to indicate something about the individual's appearance, as John White or Richard

Brown, or may have described some characteristic of the individual, as hardy, wily, strong. Again, because of some association the names of animals were sometimes used, as fox, wolf, swan. Frequently the place of habitation resulted in the application of that name to a person identified with that place. The occupation sometimes supplied the patronymic, as Henry the smith, or George the tailor, and from John's son or Richard's son comes the resultant patrilineal surname. Among the Celtic inhabitants of Scotland and Ireland, where each separate clan or tribe bore a surname, Mac was added to distinguish the son, and O to distinguish the grandson, as Macgregor in Scotland and O'Connell in Ireland. Among the Normans, Fitz was added to the father's Christian name to distinguish the son, as Fitzherbert.

These old surnames were of infinite variety and there was a great diversity in the sources of their derivation. These few examples, however, tend to emphasize and explain the great importance at common law of the formally registered baptismal name, as compared with the informal, unrecorded and descriptive surname appended by common usage and frequently changed by that same usage. The surname extended little further than the particular individual of which it was a designation or mark, and his descendants adopted it or not at their pleasure, or assumed a new name for themselves. See the excellent opinion of Judge Daily of the Court of Common Pleas of New York, which an enterprising reporter had the good sense to report in this State in Petition of John Snook, 2 Pittsburgh Reports 26 (1859).

At early common law, because of the relationship between Church and State, it was held that "a man cannot have two names of baptism, as he may have divers surnames": 2 Coke's First Institute, page 178 (Thomas' ed. 1836). For an interesting opinion on

this general subject, see Myer v. Fegaly, 39 Pa. 429 (1861).

During the reign of Henry VIII there was promulgated a regulation which required that there be maintained in every parish a record of births, marriages and deaths. This regulation operated to check the caprice of individuals in the matter of their names and to fix them as durable appellations. Since every man's name thus became a matter of record at his birth, his marriage and his death, the recording of such events in every family led necessarily to the use of one name to designate the members of that family and served to perpetuate that name, transmitting it from father to son.

Today surnames from their great variety have become a more certain mark of identity than the first name. It is a combination of the first name and the surname that now identifies the individual. He is also distinguished very generally by the use of middle names and initial letters. It took centuries, however, to develop the durability of our present day surnames. In addition to the extensive Anglo-Saxon influence on their derivation, our present surnames also come from many European sources and languages.

A review of the English authorities on this subject may be found in the Canadian case Re Rezek or Rennie, decided in the County Court of York County and reported in Ontario Weekly Notes (1947) at page 21. There was great liberality under the English common law in permitting a person to change his surname, as shown by the numerous citations in the Rennie case.

There did not carry over into the body of our common law any limitation upon the change of a given name or surname. See Bitle's Petition, 54 D. & C. 329, 332 (1945). Liberality in the matter of change of name in this State has always been allowed. In Imhoff v. Fleurer, 2 Phila. 35, 36 (1856), Hare, J., stated the common law rule as follows:

". . . In this country, where men of different races and tongues are constantly mingling in business transactions, in ignorance of the peculiarities which mark the pronunciation of the same letters in their respective languages, and where names have no higher sanction than the will of those who give and those who bear them, a liberal rule should prevail, suited to the exigencies of the situation, which differs essentially from that of the inhabitants of those countries where the State prescribes and enforces the use of baptismal registers, and regards the appellations conferred by the ministers of religion as legally binding."

The first statute relating to change of name in this State was the Act of April 9, 1852, P. L. 301. This act merely provided a mode of changing the name and was in affirmance and aid of the common law: Laflin & Rand Co. v. J. J. Steytler et al., 146 Pa. 434, 442 (1892), and the amendatory Act of April 15, 1859, P. L. 673, provided that the name adopted by the parent should enure to the benefit of the minor child. By the Act of July 9, 1919, P. L. 822, 54 PS §5, the assumption of a new name without court approval was declared unlawful, and where done for the purpose of avoiding payment of taxes or debt it was declared to be a misdemeanor. The Act of 1923 did not disturb the Act of 1919. It modified the procedure set forth in the Act of 1852, and in section 4 reënacted the provisions of the Act of 1859 with respect to children bearing the changed name of the parent.

Section 3 of the Act of 1923 provides:

"At the hearing (of the petition for change of name), any person having lawful objection to the change of name may appear and be heard. If the court be satisfied after said hearing that there is no lawful objection to the granting of the prayer of said petition, a decree may be entered by said court changing the name as prayed for: . . ." (Parenthesis supplied.)

Section 4 of the act reads, inter alia:

"Whenever . . ., a decree is made changing the name of anyone who is at the time thereof the parent of a minor child . . ., then under the care of such parent, the new name of such parent shall thereafter be borne likewise by such minor child . . .: provided, That any minor child . . ., upon attaining (his) majority . . ., shall also be entitled to the benefits of this act." (Parenthesis supplied.)

It is to be noted that the statute reads that any person having lawful objection may appear and be heard, and that if the court is satisfied that there is no lawful objection, then the court may enter a decree changing that name as prayed for in the petition. In Falcucci Name Case, 355 Pa. 588, 591 (1947), Chief Justice Maxey said:

"In this Commonwealth an individual cannot change his name without permission of the appropriate court acting upon a petition complying with the statutory requirements. In granting or refusing the petition after due hearing and notice the court has wide discretion. If there is 'lawful objection' to the granting of the petition it will be denied. If there is no such lawful objection the petition *may* be granted. Under certain circumstances a court even in the absence of lawful objection should deny such a petition. For example, if some medical practitioner petitioned for leave to change his name to that of an eminent and successful medical practitioner in the former's vicinity the court would properly deny the petition on the ground that a fraud on the public was intended. . . . A court would also properly refuse a request for a change in name if petitioner asked for the privilege of assuming a name that was bizarre or unduly lengthly or which would be difficult to pronounce or would have a ridiculous or offensive connotation. Whenever a court has discretion in any matter (as it has in the matter of a change of name)

it will exercise that discretion in such a way as to comport with good sense, common decency and fairness to all concerned and to the public."

See also Bitle's Petition, supra; Rounick's Petition, 47 D. & C. 71, 73 (1942); Weinstein's Petition, 35 D. & C. 227 (1939); Egerter's Appeal, 32 D. & C. 164 (1938); In re Ross' Contested Election, 21 D. & C. 57 (1934).

No lawful objections * have been interposed to the granting of the prayer of this petition. The sole question then is whether this court should, in the exercise of its discretion, permit petitioner to make the desired change. It is our view that a person should have the right under the Act of 1923 to change his or her name, when the purpose of the change is entirely lawful and it appears that such change will not be harmful to the rights of others or prejudicial to the public good. This view comports with the common-law rule of liberality in the matter of permitting an individual to choose another name.

The record in this case shows that petitioner's professional and social life, and her religious activities as well, are adversely affected by the use of her present name, all of which is an inconvenience to her. We think under the circumstances the request for a change of name is proper and lawful in all respects. We feel we

---

* A lawful objection within the meaning of the act would seem to be one which defeats the petition, as a matter of law and which the discretion of the court cannot overcome. For example, were a creditor of petitioner to object that publication of notice of the petition was not made, as required by law, that would be a lawful objection. A lawful objection could be entered that no certificates of official search were presented, or that petitioner did not set forth his residence for the required five-year period: Rounick's Petition, supra, at p. 73. A lawful objection could be interposed to a petition on the ground that it was for the fraudulent purpose of avoiding payment of taxes or debts. An application for change of name for any dishonest or fraudulent purpose would be subject to lawful objection. See DeRenzo's Petition, 44 D. & C. 699 (1942).

should not deny this petitioner the right to change her name where she has valid reasons for so doing.

The chief reason advanced by the objectors against permitting petitioner to change her name is that under the provisions of the act of assembly it would result in the change of the boy's name from Stephen Nathaniel Romm to Stephen Nathaniel Abrams. Their loyalty to their family name and their sentimental desire to see it perpetuated in this sole remaining person of the male line is entirely understandable. But the question that we must consider here is their desire to have their name perpetuated, as compared to the right of petitioner to effect a change in her name where she is handicapped and inconvenienced by the use of her present name.

Since we are called upon in the disposition of this petition to exercise our discretion, we must consider also the marital status that existed at the time of the death of petitioner's husband. The evidence shows that the marriage, unhappily, was not successful, and that petitioner had sought by her pending divorce action to dissolve the bonds of matrimony. The record here is replete with testimony that ill feeling had existed for some time between petitioner, her husband and his family. Sufficient evidence is shown to explain petitioner's indifference to the continued use of her husband's patronym.

That petitioner is a widow should not change her status with respect to the right to have her name changed for good cause shown. Her reasons for the requested change in this instance appear sound, even though the request is indeed unusual. For all these reasons, therefore, petitioner in our judgment should be allowed to change her name to Ida Abrams. See Application of Proman, 63 N. Y. S. (2d) 83 (1946); Binford v. Reid, 83 Ga. App. 280, 63 S. E. (2d) 345 (1951).

The legislature in the proviso clause in section 4 of the Act of 1923 clearly recognized that children would be affected by any change in the name of their parents, and therefore reserved to the children without prejudice their right in turn to change their name when they reach their majority. The meaning of the act of assembly is clear in this respect. The rights of the parents, for good cause shown, to change their name is recognized, and at the same time the rights of the change his name should he later desire to do so by children are in turn preserved. We feel then that in the existing circumstances we must allow the prayer of the petition, reserving to this child the right to resuming the surname of his father, who was a reputable member of the Philadelphia bar.

Objectors maintain that there would be a pecuniary advantage to the child if the name Romm is retained, since his grandmother made a bequest under her will that was contingent upon his retaining the Romm surname. The evidence discloses that no inventory or appraisement was ever filed in the estate. The will on its face shows that there was such wide discretion granted to the trustee in the matter of determining whether or not such bequest should vest that it is doubtful indeed that it can be said that there is any pecuniary advantage under this evidence in Stephen Nathaniel's retention of the surname Romm. The evidence shows a complete distribution of the grandmother's property during her life, practically all of which went to the three objectors in these proceedings. The will also contains a most unusual provision which says in effect that the child is not to receive the bequest if he should ever at any time bring suit to enforce any claim therefor. We feel then the pecuniary advantage to this child under the grandmother's will is not apparent.

Petitioner, on the other hand, testified that in her opinion it would be beneficial to the child from an economic standpoint to have his name changed. This opinion perhaps must be viewed in the light of the long established name of Abrams in the business with which the mother and her brothers are now identied. Objectors do not in our judgment, under all the evidence, show that it would be economically to the disadvantage of this child to have his name changed. Their objection, as heretofore stated, can only be predicated upon their interest in seeing that their brother's and father's surname is perpetuated, and our views on this question have hereinabove been fully set forth.

And now, June 5, 1951, it is hereby ordered and decreed that the name of petitioner, Ida Abrams Romm, be and hereby is changed to Ida Abrams; and that the minor child of petitioner, Stephen Nathaniel Romm, shall hereafter bear the name of Stephen Nathaniel Abrams, all in accordance with the Act of April 18, 1923, P. L. 75.